# DISPUTE OF TITLES ON PUBLIC LANDS

Y 4. In 8/13: L 23/14

JAN 28 1972

Alaska Methodist University
Depository Library

## HEARING

BEFORE THE

## SUBCOMMITTEE ON PUBLIC LANDS

OF THE

## COMMITTEE ON INTERIOR AND INSULAR AFFAIRS
## UNITED STATES SENATE

NINETY-SECOND CONGRESS

FIRST SESSION

ON

### S. 216

A BILL TO PERMIT SUITS TO BE BROUGHT AGAINST THE UNITED STATES TO ADJUDICATE DISPUTED LAND TITLES

### S. 579

A BILL RELATING TO THE PUBLIC LANDS OF THE UNITED STATES

### S. 721

A BILL TO AMEND THE ACT ENTITLED "AN ACT TO AUTHORIZE THE SECRETARY OF THE INTERIOR TO SELL CERTAIN PUBLIC LANDS IN IDAHO", APPROVED MAY 31, 1962

SEPTEMBER 30, 1971



69-805

Printed for the use of the
Committee on Interior and Insular Affairs

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1971

EXHIBIT 2
Page 1 of 5

I think all the other items on this has been discussed, as to the fairness of price and so on. I do not think I should go into this. I have spoken of this $1.25 an acre. This was, of course, the old homestead price. If this erroneous survey—or fradulent, if they want to put this terminology on it also—had been, say, discovered or brought about or recorded when it should have been 75, 80, or 100 years ago, then these people would have had the opportunity at that time to have made a homestead file on this. This was the charge that would have been put on this land at this time. So I do not see any injustice about this. If we let this go into any more length of time, we organized our organization some 9 years ago, with the promise or thought at least from the BLM that this would be solved and done over with, within a 2-year period of time.

We have now been organized 9 years, and I would like to use this as a basis: The immense expense we had as a committee over the 9 years to keep this thing alive, and the defense we had to make of our lands, we think it is time this was brought to a close one way or another. We cannot afford to any longer let the Federal Government hold us here in suspense, with this expense going against our lands. We would like to recommend that at least one of these bills be brought out of committee, that we get some action on it, and, of course, we would like to recommend also the three of them, but if 721 could be amended to include all of the land and say: Shall sell these lands, we would like to recommend that.

Senator CHURCH. Your testimony brought to my mind the possibility of another—something else we might do. That would be to make clear in one bill or another that the Omitted Lands Act was meant as a remedy, was intended to try and remedy the problem but was not meant to preempt the Color of Title Act, and that if in a given case, a person elects to pursue the Color of Title Act, and the facts of his case are such that it would be of greater advantage to him to turn to the Color of Title Act, that the omitted lands bill would not prevent him from doing so. Don't you think that might be? I do not think the Congress ever intended that this particular act should occupy the field to the exclusion of any other remedy that might be available.

Mr. POOLE. We have this in our written testimony, and we think that this should be very much considered. We do not feel that this has done away with the law. The one we quote in particular is the 1953 amendment to this Color of Title Act, and I did not dwell on it any more.

Senator CHURCH. The other thing you said that I do not understand is that as the Secretary has administered the Omitted Lands Act, he has elected to offer for sale only cultivated lands. Is that correct?

Mr. POOLE. This is correct in our particular area. I think this holds clear through the area. All of these lands as yet have not been classified, but those that they have offered for sale, they have offered to sell and allowed us to file on the lands that have been reduced to cultivation, but not those that are——

Senator CHURCH. That is strange because the language of the act as it is described here by the Justice Department is as follows: "The act also accorded a preference right to purchase such lands to any citizen who in good faith under color of title or claiming as a riparian owner placed improvements upon, reduced to cultivation, or occupied

EXHIBIT 2
Page 2 of 5

Case 3:92-cv-00734-HRH    Document 171-3    Filed 03/14/2006    Page 3 of 5

55

such lands prior to March 30, 1961," so the language of the law was not that restrictive.

Mr. POOLE. This is right. We wanted to point this out. There are other proceedings that they agreed with us and this action took place, the steps that they would follow, that BLM has not followed either. We had the opportunity when this classification was made, or supposedly had the opportunity, to sit down with them and question the classification, but this has not been afforded to us.

We were just notified that these lands would be sold and these over here would not be.

Senator CHURCH. Thank you very much. I have no questions. Senator Jordan?

Senator JORDAN. That was a good statement. The public interest 100 years ago was to get the land settled and to build a nation. That public interest was established by Congress in the Homestead Act and other acts of land disposition. Who, in your opinion, is the proper spokesman for the public interest now? Is it the Congress or Justice Department or the Department of Interior? Who would you look to for proper redress?

Mr. POOLE. I certainly would not want to go to the Justice Department after what I heard this morning. [Laughter.]

Senator JORDAN. Thank you.

Mr. POOLE. This is probably a rash statement, but I feel this way.

Senator JORDAN. Thank you.

Senator CHURCH. I think that was pretty much on the ball, considering the testimony this morning. Thank you very much.

Mr. POOLE. I thank you for the opportunity.

Senator CHURCH. Our next witnesses are Thomas E. McKnight, of the Title Insurance Co. of Los Angeles, and William J. McAuliffe, Jr., of the American Land Title Association, who will appear together.

**STATEMENTS OF THOMAS E. McKNIGHT, TITLE INSURANCE AND TRUST CO., AND WILLIAM J. McAULIFFE, JR., AMERICAN LAND TITLE ASSOCIATION**

Mr. McKNIGHT. Senators, Mr. McAuliffe and myself appreciate this opportunity to testify in support of S. 216. The ALTA regards this legislation as seriously needed and urges its enactment as soon as possible. Under present law, the private landowner has no right to try, in an action to quiet title, to free his land of actual or potential claims of the United States relating to questions of ownership, boundary, or use. Hundreds of such actual or potential claims exist today, however valid, and the fact that the private landowner cannot test the validity or existence of such claims in a court of competent jurisdiction, frustrates the use, development, and marketability of such affected lands.

I would like to respectfully ask that the prepared statement that was submitted to you be entered as part of your records, and also the supplementary statement.

Senator CHURCH. That will be done.

Mr. McKNIGHT. I would like to summarize the original statement in the interest of time. We attempted to raise examples of circumstances which illustrate the need for S. 216. The first example indi-

EXHIBIT 2
Page 3 of 5

cated a situation where land was patented to a railroad under the granting acts of 1866 and sold by the railroad. Subsequently, the United States found that the railroad was not entitled to the land.

Meanwhile, the railroad sold the property, and in the litigation which ensued subsequently, 1890, the purchaser was not served, and judgment ultimately acquired was not recorded. The present owner, based upon the public records, feels that he owns the land. However, the forestry department also claims the lands, based upon the 1890 litigation. The present owner feels his title is secure as a good-faith purchaser of value, but this has existed for 6 years and no one can move. The property is extremely valuable, and it is holding up a multimillion-dollar project.

The second example I raise is the situation which probably you gentlemen are familiar with, and that is the fact that between 1905 and 1922, under the Forest Selection Act which had expired by 1905, there existed thousands of acres of land which had been offered to the United States as base for exchange of lands outside the forestry areas. At this time, when the original act expired, there was no act directing that the offered land be returned.

Therefore, probably as a matter of expediency, the Secretary of the Department of the Interior wrote many, many letters wherein he stated that the offer of the base lands had not been accepted, that the United States had no interest in the land, and suggested that his letter be recorded in the records, in the local records of the county recorder to perfect the chain of title to the lands which had been offered to the United States.

Now, this is a real serious situation because I am told that there are probably 10,000 acres of land in Montana whose title is based like this, 15,000 to 25,000 acres in California, 2,000 in one county alone in Washington, and probably many other thousands of acres in the other parts of the United States. This would seem to be a situation where if we could get the United States into court to determine whether there was equitable estoppel against a sovereign by reason of this letter, we would solve probably most of these problems in one swoop.

Nevertheless, it is a serious problem and I do not know any other way to rectify it. Under the present regulations of the Department of the Interior, Bureau of Land Management, the word has gone out to the district offices that as much of this land be recovered—recaptured is the word—by not honoring these letters. What the ultimate result will be, I do not know.

The third example——

Senator CHURCH. Let me ask this one question: If the law is changed through the passage of S. 216 so that you can get access to the courts, in the case that you just described, would the doctrine of equitable estoppel be available to the litigants against the Government or would the Government still be able to claim sovereign immunity?

Mr. MCKNIGHT. Well, sir, under somewhat similar circumstances in the case of *Longby v. Mansel* handed down the first part of this year, equitable estoppel again raised, based on the fact that the sovereign knew of the situation, they acted and expected the persons who they were in contact with to rely upon their acts. Those persons did so and were damaged and, therefore, they should not be able to deny the effect of their acts.

EXHIBIT 2
Page 4 of 5

Senator CHURCH. So you think then if you can get the Government into court, you probably, in proper cases, could assert equitable estoppel.

Mr. McKNIGHT. Yes, sir. The third example relates to lands along the great rivers of the Nation, particularly along the Colorado River between California and Arizona. This is not the only river in which accreed lands have been created.

The problem is, in many instances, there is no way of knowing if the Government owns adjoining property across the river and the river moves back and forth where the accreed lands belong to the Government or the private landowner.

I was recently in Missouri and in that circumstance, there the Missouri River had moved almost a mile in a matter of 50 years and the only title was based upon accretion. In that circumstance, we were able to determine that there could be no one other than the owner who owned the accretion because of the law in Missouri which gave accreed lands to the local, county, and so forth. It occurred to me in listening to the testimony of the land along the Snake River that this is a problem there and I do not know whether the Snake River is navigable or not, what consideration be given to the State title if it was not navigable, and all the other related problems.

The next problem I pointed out is the fact that in many instances, the validity of the patents are in question because of the known mineral character of the land. Often, we find that the plats and field notes of the township as surveyed indicates the mineral character. Yet, the patent comes out with no revelation on minerals. Six year statute of limitation has not run. We do not have a good faith purchaser so we have a problem. The other situation involves the boundary of disputed lands between the private landowner and the United States, similar here to the Snake River problem and others. Now, this gets to be a real serious situation where the land is extremely valuable and the private owner, his land abuts the Government land, whether it be a forestry research or some other public lands outside the forest. I have in mind circumstances where the survey indicated on your left the tier of lots in this subdivision, and on the bottom they were out of title.

Now, I do not expect what I have in mind is trying to establish whether the Government survey which created this situation was correct or incorrect. That is the same problem as your Snake River problem, to determine whether the Government's survey was correct or incorrect. In the upper right hand corner, we find land which is being sold for $20,000 an acre being occupied by the forestry people and we have no way of forcing any agreement as to boundary with these people without voluntary action on their part. We have another problem with regard to railroad rights-of-way, abandoned railroad rights-of-way. In particular, I am thinking of the Atlantic and Pacific Railroad running from Needles to Ventura, Calif. A matter of 300 miles. The original grant was abandoned in the eighties and the right-of-way existed until the 1960's when it was also abandoned by Congress but for researching minerals.

This right-of-way runs through some of the fast developing areas of California. In fact a new airport is in that vicinity. We are not as much concerned with anything except the right of entry in connection with

