APPLICATION TO FEDERAL SUBSISTENCE BOARD
FOR DETERMINATIONS AND ACTIONS NEEDED
BY APPLICANT COMMUNITY AND INDIVIDUALS
LAWFULLY TO HARVEST AND SELL HERRING ROE
UNDER FEDERAL "CUSTOMARY TRADE" AUTHORITY

RECEIVED
OCT 09 1992
Law Offices of
Gianchini & Associates

APPLICATION TO FEDERAL SUBSISTENCE BOARD
FOR DETERMINATIONS AND ACTIONS NEEDED
BY APPLICANT COMMUNITY AND INDIVIDUALS
LAWFULLY TO HARVEST AND SELL HERRING ROE
UNDER FEDERAL "CUSTOMARY TRADE" AUTHORITY

TO: Federal Subsistence Board, consisting of:
    (1) Alaska Regional Director, Fish & Wildlife Service;
    (2) Alaska Regional Director, National Park Service;
    (3) Alaska Regional Forester, USDA-Forest Service;
    (4) Alaska State Director, Bureau of Land Management; and
    (5) Alaska Area Director, Bureau of Indian Affairs.
    (6) Chairman Curtis V. McVee, Special Assistant to the Secretary of the Interior

FROM: Several rural Alaskan residents, including a community of the following three southeastern Alaska native bands of Thlingits and their members:
    (1) the South Kuiu Kwaan, and its individual members;
    (2) the Shakan Kwaan, and its individual members; and
    (3) the Taanta Kwaan, and its individual members.

DATE: April 2, 1991.

SUBJECT: Board determinations and actions needed in order that the Applicants may lawfully harvest and sell, as "customary trade," herring roe from the traditional territorial waters of the Applicant community.

AUTHORITY: Controlling federal and state law, including:
    (1) ANILCA (16 U.S.C. secs. 1301 _et seq._;
    (2) Federal Subsistence Regulations (50 CFR Part 100; Fed. Reg. 27121 _et seq._, June 29, 1990); and
    (3) Pertinent federal and state court decisions.

SPECIFIC ACTIONS REQUESTED:
    (1) Board issuance of a document, suitable for display by Applicants to law enforcement officers at the time and place of harvesting of the herring roe, evidencing the lawfulness of such harvesting in the manner and amount deemed proper by the Board as "customary trade" under controlling federal law.
    (2) Board issuance of a document, suitable for display by Applicants to a prospective buyer of the herring roe, evidencing the lawfulness of such sale in the amount deemed proper by the Board as "customary trade" under controlling federal law.

1

## STATEMENT IN SUPPORT OF APPLICATION

### 1. The Applicants are "rural Alaska residents" under ANILCA.

The community Applicant embraces the South Kuiu Kwaan, the Shakan Kwaan, and the Taanta Kwaan. These Kwaans are bands of Thlingit Indians who have lived in what is now southeastern Alaska since time immemorial. The territorial waters within which these three bands have traditionally fished for herring roe are described with particularity in Attachment A hereto. A description of the customs and laws of the three bands, relative to the harvesting of herring roe and to its disposition by distribution to members and sale to non-members, is also set forth in Attachment A. Because their herring roe harvests have traditionally been conducted collectively by the members of each Kwaan and under the direction of the tribal elders of each Kwaan, the three Kwaans are making application as a community of allied tribal entities, as well as on behalf of their members.

The individual Applicants are registered native Alaskans, each of whom has documentation showing that he or she has been officially recognized as eligible for BIA and other federal programs established for the benefit of Indians in Alaska. Each of the individual Applicants is listed by name in Attachment B, which consists of membership lists for each of the three bands or Kwaans who are jointly making a community application to the Board, along with the several applications of the individual Applicants.

The Applicants believe that there can be no doubt as to their being "rural Alaska residents" for purposes of ANILCA. However, to make sure that this point is established to the satisfaction of the Board, we have attached hereto an affidavit by the official spokesman for the governing tribal elders of each of the three Kwaans, swearing that to the best of the affiant's personal knowledge and belief each and all of the members named on the membership list of that affiant's Kwaan is in fact a "rural Alaska resident" as defined by ANILCA and 50 CFR Sec. 100.4. (See affidavits by the three Kwaan spokesmen, in Attachment C.)

2. <u>The waters where the Applicants intend to harvest their herring roe are marine waters along the shores of the Tongass National Forest, public lands which were federally reserved for national forest purposes prior to Alaska statehood, and thus such waters are within the Board's jurisdiction under the Board's prior determinations as to public lands covered by the new federal subsistence regulations and ANILCA.</u>

The affidavits contained in Attachment C establish as fact that each and all of the traditional locations where the Applicants intend to harvest herring roe are in shallow marine waters lying immediately adjacent to the shores of the Tongass National Forest. As a matter of public record, the Tongass National Forest was set aside from the public domain and federally reserved for national forest purposes, long before Alaska became a state. Consequently, the waters where the Applicants intend to conduct their "customary trade" harvest of herring roe are within the Board's jurisdiction

3

and are "public lands" within the meaning of the federal subsistence regulations, irrespective of whether or not those waters might be "navigable waters" as the Board has used that term with reference to public lands which are not federally "reserved" lands.

3. The Applicants have made "customary and traditional use" of herring roe, within the meaning of ANILCA.

The affidavits contained in Attachment C establish that the Applicants have since time immemorial made "customary and traditional use" of herring roe, within the meaning of ANILCA and 50 CFR Sec. 100.4. The Applicants have not only traditionally harvested herring roe spawned on naturally growing kelp, but have also traditionally nurtered the kelp and augmented it with artifically placed branches from non-marine trees and shrubs upon which the herring also spawn. The traditional methods which the Applicants have used to foster, facilitate, control, and perpetuate the healthy harvest of naturally spawned herring roe in the territorial waters of the three Kwaans are further set forth in detail in the affidavits contained in Attachment C.

4. Prior to the enactment of ANILCA, the Applicants had established "customary trade" in herring roe within the meaning of ANILCA and 50 CFR Sec. 100.4, including large volumes of herring roe commercially harvested and sold to both Indian and non-Indian buyers.

The affidavits in Attachment C show that, long prior to the enactment of ANILCA in 1980, the Applicants were engaged in

4

## ATTACHMENT A
## TERRITORIAL WATERS WHERE APPLICANTS
## WILL HARVEST HERRING ROE ON KELP

## ATTACHMENT A

### TERRITORIAL WATERS WHERE APPLICANTS WILL HARVEST HERRING ROE ON KELP

The following are detailed descriptions of the historic boundaries of the three Kwaans, where the Applicants have traditionally harvested herring roe on kelp. No attempt is made to locate precisely the exact locations of the various spawning areas where the Applicants have traditionally and will in 1991 harvest their herring roe on kelp. However, as the Affidavits in Attachment C establish by sworn testimony, each and all of the traditional harvesting areas are in shallow marine waters along the shores of the Tongass National Forest, which the Applicants understand has been reserved public land of the United States since the early part of this century.

The following Kwaan boundaries are accurate to the personal knowledge and belief of the Kwaan spokesmen, as attested in the Affidavits contained in Attachments C-1, C-2, and C-3.

### KUIU KWAAN BOUNDARIES:

The northern boundary starts at the midway point of Chatham Straits between Baranof Island and Point Ellis, of the western shore of Kuiu Island; such northern boundary lays on 56 degrees and 34 minutes and 0 seconds latitude; continues eastward immediately above Point Ellis along the above-mentioned latitude to the eastern shore of Kuiu Island and exits at the southern mouth of Three Mile Arm; and thence proceeds in a southeasterly direction aimed at the northern point of Skiff Island, with the Kuiu boundary stopping at a point 1.5 miles short of Skiff Island; and

A-1

the eastern boundary begins at this point and thence proceeds southward to a point halfway between Sumner Island and Strait Island; and thence proceeds southward to a point halfway between Boulder Point and Labouchere Island; and thence proceeds southward to a point halfway between Point Amelius and Barrier Islands; and thence proceeds southward to a point halfway between Point St. Albans and Ruins Point; and thence proceeds in a southwesterly direction to a point halfway between Cora Point of Coronation Island and Point Borlase of Warren Island; and

the southern boundary begins at this point and thence proceeds to a point halfway between Helm Point and the southern end of Warren Island; and thence proceeds in a southwesterly direction to a point halfway between Hazy Islands and Timber Islands; and thence proceeds in a generally southwesterly direction out to the continental shelf which forms the basis of the Kuiu Kwaan conservation and economic operating zone; and

the western boundary is in the region of Chatham Straits. The travelling and fishing waters of Chatham Straits are equally divided between Kuiu Island and the eastern shore of Baranof Island, which starts at a point halfway between the eastern shore of Baranof Island and Kuiu Island at 56 degrees and 34 minutes and 0 seconds; and thence proceeds southward to a point halfway between Baranof Island and Point Harris on Kuiu Island; and thence proceeds southward to a point halfway between Point Howard of Kuiu Island and Cape Ommany of Baranof Island; and thence proceeds in a southerly direction to a point halfway between Nation Point and Cape Ommany; and thence to a point halfway between Hazy Islands and

A-2

Cape Ommany.

The Kuiu Kwaan boundaries encompass all of Kuiu Island south of 54 degrees and 34 minutes and 0 seconds latitude, and all of Kuiu Island's satellite islands, rocks, reefs and fishing grounds, including Spanish Islands, Coronation Island, and Hazy Islands and their surrounding waters, rocks, reefs and islets.

SHAKAN KWAAN BOUNDARIES:

The northern boundary starts at the midway point in Sumner Strait between Sumner Island and Point Barrie; and thence proceeds eastward to a halfway point between Strait Island and Point Barrie; and continues eastward between Point Baker and Yellow Island; and thence proceeds eastward to a point halfway between Pine Point and Mitchell Point; and

the eastern boundary begins at the midway point between Pine Point and Mitchell Point; and thence proceeds southward to Pine Point; and thence continues southward to the middle of El Capitan Passage commencing at a point midway between Aneskett Point of Kosciusko Island and the Prince of Wales shore; and thence proceeds southward down the center of El Capitan Passage equidistant between Kosciusko Island and Prince of Wales Island to a halfway point between El Capitan Island and Tuxekan Island; and thence proceeds in a southwesterly direction to a halfway point between Cap Island and Tuxekan Island; and thence proceeds in a southwesterly direction halfway between Hoot Island and Tuxekan Island; and

the southern boundary begins at this point and thence proceeds in a westerly direction equally dividing Sea Otter Sound to a point midway between Fox Rock and Gas Rock, immediately off the shore of

A-3

Port Alice; and thence proceeds to a point halfway between Whale Head Island and Surf Point; and thence proceeds in a westerly direction equally dividing Iphigenia Bay; and thence proceeds in a generally southwesterly direction to the continental shelf which forms the basis of the Shakan Kwaan conservation and economic operating zone; and

the western boundary begins at this point and thence proceeds in a northeasterly direction to a point halfway between Point Borlase and Cora Point; and thence proceeds in a northeasterly direction to a point midway between Ruins Point and Point St. Albans; and thence proceeds northward to a point halfway between Barrier Islands and Point Amelius; and thence proceeds in a northerly direction to a point halfway between Labouchere Island and Boulder Point; and thence proceeds in a northerly direction between Strait Island and Sumner Island; and thence proceeds in a northerly direction between Point Barrie and Sumner Islands.

The boundaries of the Shakan Kwaan encompass all of the northwest portion of Prince of Wales Island, Kosciusko Island, Hamilton Island, Middle Island, Barrier Islands, Bluff Island, Strait Island, Warren Island, Whale Head Island, Marble Island, Orr Island, El Capitan Island, Cap Island, Hoot Island, Owl Island, Eagle Island and White Cliff Island, with all of their satellite islands, rocks and reefs.

TAANTA KWAAN BOUNDARIES:

The northwest boundary of the Taanta Kwaan is common with the eastern and southern boundaries of the Kuiu Kwaan and Shakan Kwaan as delineated above; and

the northeastern boundary of the Taanta Kwaan extends to the regions of the interior Thlingits in the vicinity of the fishing and hunting areas around the Whitehorse, Yukon Territory; and

the eastern boundaries of the Taanta Kwaan are formed by the headwaters of the river systems that flow in and through the Thlingit bioregion which is bordered on the south by the Skeena River; and

the southern boundary of the Taanta Kwaan extends westward from the Skeena River to a point 200 miles outward from the continental shelf which forms the basis for the Taanta Kwaan conservation and economic operating zone; and

the western boundary of the Taanta Kwaan extends northward to a point located west of the point of beginning at the southwestern end of the Kuiu Kwaan and Shakan Kwaan boundaries as described above.